Larry MAY, Petitioner,

v.

Robert HOKE, Superintendent, Eastern Correctional Facility, Respondents.

No. CV 87–1307(RR).

United States District Court, E.D. New York.

Nov. 30, 1988.

Larry May, Napanoch, N.Y., pro se.

Richard Levitt, New York City, for petitioner.

Elizabeth Holtzman, Kings County Dist. Atty. by Shalom Twersky, Asst. Dist. Atty., Brooklyn, N.Y., and Robert Abrams, New York State Atty. Gen., State of New York Dept. of Law by Gerald J. Ryan, Asst. Atty. Gen., New York City, for respondent.

## MEMORANDUM AND ORDER

RAGGI, District Judge:

Larry May, who was convicted on February 19, 1980, after a jury trial in New York State Supreme Court, Kings County, of Murder in the Second Degree (N.Y.Penal L. § 125.25[1], [3]), Robbery in the First Degree (N.Y.Penal L. § 160.15[2]), and Criminal Possession of a Weapon in the Second Degree (N.Y.Penal L. § 265.03) petitions *pro se* for a writ of habeas corpus. He challenges his conviction on the grounds: (1) that he was denied his sixth amendment right to confront an accomplice whose post-arrest statement was used against him by the prosecution; and (2) that the prosecution impermissibly withheld material that could have impeached the credibility of a police officer who testified against him. On January 27, 1988, the court appointed counsel to assist petitioner in presenting his arguments. Having now considered all submissions, and having heard orally from counsel, the court concludes that the petition is without merit.

## FACTUAL BACKGROUND

### 1. *The Murder of Aaron Miller*

Numerous eyewitnesses testified that on January 15, 1979, Larry May, Brison Hamilton and Peter Charles entered a social club at 1135 St. John's Place in Brooklyn, brandished guns and announced to the twenty patrons who had been gambling at the club that this was a robbery. While May watched the door, Hamilton and Charles proceeded to collect money and valuables from the patrons. One of the men present in the club, Donald Payton, was a New York City Housing Police Officer. He identified himself to the robbers and urged them not to hurt anyone. Instead, they demanded his service revolver which was turned over to May.

As the robbers continued their search of each patron, Aaron Miller, a frequent visitor to the club, entered the premises. In a split second he realized what was going on and tried to retreat. Larry May sought to pull Miller inside but, with a revolver in each hand, was not quite able to do so. As Miller broke free, May fatally shot him twice.

The three robbers fled the scene in a late-model Ford Zephyr. It was subsequently learned that Hamilton's girlfriend owned a 1979 Zephyr. Moreover, at the time of Hamilton's arrest, police found Donald Payton's service revolver in his home.

### 2. The Involvement of Peter Charles

Because May claims that he was denied his right to confront co-defendant Peter Charles, some background as to his involvement in events occurring after the murder, as well as his availability at trial, is necessary.

Patrons of the social club who were interviewed by the police after the murder identified one of the robbers as an individual known on the street as "Bo–Peep," or "Bo–Pete." Police intelligence disclosed that Officer Frank Beltrani of the 75th Precinct knew an individual who went by that name. Beltrani was contacted and identified "Bo–Peep" as Peter Charles. At trial, Officer Beltrani explained that Charles and his brother, Trevor Williams, sometimes served as low-level street informants for him.

Officer Beltrani testified that on January 17, 1979, he spoke with Trevor Williams

and as a result of the conversation, that same day met with Peter Charles who surrendered himself to the authorities and made a statement about the Miller homicide. Thereafter, police retrieved certain weapons from a given location and proceeded to look for Larry May and Brison Hamilton.[1]

On June 13, 1979, Charles pleaded guilty to manslaughter in connection with the events of January 15, 1979. In his allocution, he inculpated both Hamilton and May, specifically stating that "Larry May had pulled the trigger."

Sometime prior to the Hamilton/May trial, Charles withdrew his plea of guilty. An affidavit submitted by the prosecution to the state courts reveals that, during the trial, Charles began to make demands on the prosecution in connection with the disposition of his own case. When these were not acceded to, he refused to testify on behalf of the People. The prosecutor states, under oath, that at no time during the May/Hamilton trial did Charles exculpate either defendant.[2]

On November 23, 1979, the seventh day of the May/Hamilton trial, May's counsel advised the court that her client had learned that Charles wished to speak to her. The court signed an order directing his production from Rikers Island.

In the interim, both May and Hamilton took the stand in their own defense. Hamilton denied any involvement with the events at the St. John's Place social club on January 15, 1979 and, in fact, denied ever being inside that club. He denied possessing Payton's revolver and he, his mother and fiance denied that the revolver was in

---

**1.** On direct examination, Officer Beltrani did not recount anything Charles said in his statement, but testified only to the actions he and other police officers took thereafter. It was May's counsel who, on cross-examination, probed into the content of at least one aspect of Charles's statement, asking Beltrani whether Charles had, on the night of his arrest, given the police the names "Jacobs," "Ellison," "Seeds," or "Outlaw." To each name, Beltrani responded negatively, volunteering that Charles had given the police only two names. On redirect, the prosecution adduced, without objection, that those two names were Larry May and Brison Hamilton.

**2.** Charles would subsequently stand trial for murder and robbery. Testifying in his own behalf, he claimed his post-arrest admission and the inculpation of Hamilton and May were coerced by Officer Beltrani and his partner. He admitted that this was the first time he was departing from his post-arrest statement, thereby confirming the prosecutor's statement that Charles had not previously exculpated the defendants. Charles's testimony that he was coerced into making a false admission was obviously rejected by the jury, which found him guilty.

his home at the time of his arrest. His mother and other family and friends testified that he was home at the time of the Miller shooting. Hamilton testified that he had never met May before their arraignment. His familiarity with Charles was purportedly limited to an argument the two had had over Charles's attempt to sell Hamilton's nephew some drugs.

By contrast, May admitted being at the social club on the night of January 15, 1979. Indeed, he said he had been there four times that month and a few times in 1977 as well. He denied, however, any involvement in the robbery or Miller murder. He claimed he had gone to the club only to collect money he had won on the numbers that day from Aaron Miller. When May first went to the club, Miller was not there. May then went to a nearby store. When he exited, he saw Miller right outside the club. Miller agreed to pay May the money owed inside the club. As the two men began to enter, Miller ahead of May, Miller was shot dead. May fled the scene. May denied knowing either Charles or Hamilton until they appeared together in court.

On cross-examination of both Hamilton and May, the prosecution asked each whether certain particulars about the crime were true. Apparently, these particulars, which were read verbatim from a document held by the prosecutor as he examined, had been provided by Peter Charles after his arrest, although neither this fact nor the document was ever directly revealed to the jury. Both men categorically denied each statement.[3]

By the end of the day on November 26, 1979—the same day May testified and was subjected to the challenged cross examination premised on Charles's post-arrest statements—Charles had still not been produced for consultation with May's counsel pursuant to the court's order. The court agreed to be "in recess until we get a hold of Mr. Charles." Sometime later that afternoon, a corrections officer reported that Riker's Island could not "find" Charles in his dormitory, that he was apparently "hiding" to avoid coming to court. May and his counsel both then stated on the record that they were satisfied to rest without meeting Charles.

### 3. *The Indictment of Officer Beltrani*

Frank Beltrani was not the police officer with primary investigative responsibility

---

**3.** The questioning of May in this regard was as follows:

> Q. . . . Mr. May, did you and Butch [i.e., Hamilton] and Peter Charles go to that premises, Butch being the first one in, Butch opening the door; yes or no?
> A. No.
>
> .　　.　　.　　.　　.　　.
>
> [Objection overruled]
> Q. Now, isn't it true, Mr. May, that Peter Charles carried a .22 caliber that night and you and Butch carried a .38 caliber gun that night?
> A. It's not true.
> I didn't carry any gun that night.
> Q. And isn't it true that Butch put money in a hat, you were standing at the door with two guns in your hand?
> A. No, it's not true.
> Q. And isn't it true, Mr. May, that Roz told you and the others in that club that there was a cop in there and you said, "Well, give me your gun. I know you have a gun."
> And that Larry Payton said to you, "I got a gun on him?"
> A. No, it's not true.
> Q. That's not true?

Let me ask you this, Mr. May. Do you recall being in the getaway car with Butch and Peter Charles after the robbery?
> A. No.
> Q. Well, do you remember being asked this question by Mr. Charles and giving him this answer?
> A. No.
> THE COURT: Being asked this questin by Mr. Charles?
> MR. SAMUEL: Yes.
> A. No.
> Q. Let me ask the question, maybe you will remember.
> A. How can I remember if I don't know Mr. Charles?
> THE COURT: Wait for the question, sir.
> [Objection overruled]
> Q. Now, did you give this answer to Mr. Charles?
> A. No.
> Q. "Question: You didn't have to shoot the guy.
> "Answer:" to Mr. Charles, "I had a brother that got killed in a robbery and since then if anyone tries anything I'm not hesitating."
> Did you say that to Mr. Charles in the car?
> A. No.

for this case. As already indicated, however, he did identify "Bo–Peep" as Peter Charles and was instrumental in effecting his arrest. On the stand, Beltrani testified to recognizing all three defendants and to having seen them together in the area of New Lots Avenue a few weeks before January 15, 1979. On cross-examination, he admitted that he never actually saw the three men talking or meeting. Rather, they were among a number of people he had seen all together at that location.

On cross-examination, Beltrani also responded negatively to defense counsel inquiries as to whether he had ever been disciplined in connection with his work or been the subject of any citizen complaints. He did admit recently testifying in the grand jury to his involvement in an incident where a youth had been shot dead. On redirect, the prosecution had the officer explain in general terms, over objection, the merit awards and citations reflected by various insignia on his uniform. The court immediately instructed the jury that they were not trying the officer's bravery or the circumstances that had led to his receipt of medals.

Defense counsel subpoenaed Officer Beltrani's personnel file. They did not seek to pursue further cross-examination after examining the file.

On November 28, 1979, the day after the jury returned its verdict of guilty in the May/Hamilton case, the Office of the Special Prosecutor investigating New York's criminal justice system sought and obtained an indictment against Officer Beltrani for extortion, bribery and official misconduct. Beltrani and other members of the 75th Precinct Anti–Crime Unit had been the focus of a confidential investigation into allegations of bribery and extortion. Howard W. Newman, the former Special Assistant Attorney General who conducted the investigation, advises this court in a sworn affidavit that the investigation was conducted primarily through the use of a confidential police informant working within the Anti–Crime Unit. Officer Beltrani was never called to testify before the grand jury in connection with the investigation, nor was he given any official notification that he was a target of the grand jury's inquiry, although he may have been aware of a general investigation into the affairs of his unit.

Mr. Newman further states that it was the policy of the Special Prosecutor's office not to disclose confidential investigations to the various District Attorneys' Offices. He emphatically states that he had no communication with anyone involved in the May prosecution concerning the investigation of Officer Beltrani. He does, however, recall that in June and July of 1979, he contacted members of the District Attorney's Grand Jury Bureau to obtain information regarding Beltrani's testimony in the case of *People v. Warren Bell*, revealing only that an informant had stated that such testimony might be perjurious.[4]

Mr. Newman had, in January 1980, at the request of May's counsel, reviewed a transcript of Beltrani's trial testimony for any evidence of perjury. He concluded that all responses given at trial were "legally true." He reaffirms that position to this court.

Beltrani stood trial on the indictment brought against him. He was convicted of official misconduct but, when the jury could not reach a verdict on the remaining counts, he pleaded guilty to bribery. On September 14, 1981, he was sentenced to two concurrent one-year sentences.

### 4. *Procedural History*

On January 28, 1980, petitioner moved to set aside the verdict on the grounds of newly discovered evidence, specifically, the indictment of Officer Beltrani and the recantation of Peter Charles. N.Y.C.P.L. § 330.30. On February 19, 1980, the trial court denied the motion and sentenced May

---

**4.** According to the government, the informant alleged that Beltrani's arrest in the *Bell* case, made outside his duty precinct, was possible only because he was running a bodega in that area at a time when he was supposed to be on duty elsewhere. A question thus arose as to whether Beltrani would lie in the grand jury about the circumstances that led to his presence at the scene of the arrest. In fact no perjury charges were ever filed.

to concurrent terms of twenty-five years to life imprisonment for murder, eight and one-third to twenty-five years for robbery, and five to fifteen years for possession of a weapon.

The conviction was affirmed without opinion on February 28, 1983, *People v. May*, 92 A.D.2d 753, 459 N.Y.S.2d 953 (2d Dep't 1983), and leave to appeal was denied on June 24, 1983, *People v. May*, 59 N.Y.2d 975, 466 N.Y.S.2d 1036 (1983).

On August 3, 1983, petitioner sought collateral review of his conviction, alleging that he had been denied effective trial counsel and that further new evidence had been discovered, namely a statement by Peter Charles that he had told the prosecution he was willing to testify for May at trial. N.Y.C.P.L. § 440.10[1](g), (h). The motion was denied on October 6, 1983, and again on March 11, 1986 after reargument. On March 25, 1987, the Appellate Division, Second Department, denied leave to appeal.

On April 28, 1987, May filed his petition with this court.

## DISCUSSION

### 1. *Denial of the Right of Confrontation*

Petitioner contends that throughout his trial the prosecutor used the confession of Peter Charles against him without his having the opportunity to confront Charles as required by the sixth amendment. *See Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); *accord Richardson v. Marsh*, 481 U.S. 200, 207, 107 S.Ct. 1702, 1707, 95 L.Ed.2d 176 (1987); *Cruz v. New York*, 481 U.S. 186, 189–91, 107 S.Ct. 1714, 1717–18, 95 L.Ed.2d 162 (1987). In fact, Charles's confession was never directly introduced into evidence. At best, petitioner relies on three oblique uses of the confession that he contends rise to a constitutional violation: (1) the prosecutor's unobjected-to opening statement that, after his arrest, Peter Charles told the authorities "certain things concerning his involvement in the crime, and as a result thereof, the police began to look to May and Hamilton;" (2) testimony to that effect by Officer Beltrani; and (3) the cross-examination

of both defendants with facts provided by Peter Charles.

### A. *The Opening Statement*

Although petitioner did raise a confrontation clause challenge to his conviction in his state appeal, he did not state as a factual basis for this challenge the prosecution's opening remarks. A federal court is precluded from reviewing on habeas corpus a claim not "fairly presented" to the state court. *Daye v. Attorney Gen. of the State of N.Y.*, 696 F.2d 186, 191 (2d Cir.1982) (en banc), *cert. denied*, 464 U.S. 1048, 104 S.Ct. 723, 79 L.Ed.2d 184 (1984). Fair presentation requires the state court to be informed of "both the factual and the legal premises of the claim." *Id.* at 191.

Petitioner suggests that a challenge to the opening may have been made orally to the Appellate Division by his counsel. Absent an affidavit, or some court record to support this position, the court declines to speculate that this occurred, particularly since the papers seeking leave to appeal to the Court of Appeals are devoid of any reference to the opening.

To the extent this failure to exhaust results in the presentation of a mixed petition, dismissal would normally be required. *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). May has, however, indicated a willingness to amend his papers to delete the unexhausted claim as allowed under *Rose. Id.* at 510, 102 S.Ct. at 1199; *see also Petrucelli v. Coombe*, 735 F.2d 684, 687 (2d Cir.1984). The court accordingly proceeds to address the exhausted claims.

### B. *Testimony of Officer Beltrani*

Petitioner's claim that the prosecution used Peter Charles's confession against him by adducing testimony from Officer Beltrani that Charles made a statement and that, based on that statement, the police looked for May and Hamilton is procedurally barred from federal review. There was no objection by defense counsel to this testimony. Thus, on appeal, the government argued waiver, N.Y.C.P.L. § 470.05(2) (contemporaneous objection

rule), and the appellate division affirmed without opinion. When an appellate court affirms without opinion following an argument of procedural default, the presumption is that the decision is so premised. *Rodriguez v. Scully*, 788 F.2d 62, 63 (2d Cir.1986); *Taylor v. Harris*, 640 F.2d 1, 2 n. 3 (2d Cir.) (per curiam), *cert. denied*, 452 U.S. 942, 101 S.Ct. 3089, 69 L.Ed.2d 958 (1981).

█ A federal court will only review an issue that has not been raised in accordance with state procedure where petitioner can establish both good cause for his default and actual prejudice resulting therefrom. *Rosenfeld v. Dunham*, 820 F.2d 52, 54 (2d Cir.), *cert. denied*, — U.S. —, 108 S.Ct. 463, 98 L.Ed.2d 402 (1987); *See also Wainwright v. Sykes*, 433 U.S. 72, 86–87, 97 S.Ct. 2497, 2506–2507, 53 L.Ed.2d 594 (1977). Cause exists when "some objective factor external to the defense impede[s] counsel's efforts to comply with the State's procedural rule." *Amadeo v. Zant*, 486 U.S. 214, 108 S.Ct. 1771, 1776, 100 L.Ed.2d 249 (1988) (quoting *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed. 2d 397 (1986)).

In this case, petitioner cannot establish either cause or prejudice. May argues that the government led his counsel to believe that Charles would be testifying, and that this lulled her into not objecting to any hearsay elicited from Beltrani because she thought Charles would eventually be on the stand. The court first notes its skepticism that May's trial counsel, who represented him with vigor and determination throughout, was lulled into anything. Moreover, every experienced trial lawyer knows that no witness's appearance at trial can be relied upon until the individual is actually taking the oath. Indeed, in this case when defense counsel opened by saying that Peter Charles "would" testify, an objection from the prosecution resulted in her quick amendment that she "believed" he would testify. Not insignificantly, no affidavit from trial counsel has been put forward to support the contention that she haplessly relied on government representations in failing to object to Beltrani's testimony.

Further, the court notes that the mere fact that a hearsay declarant will, at some point in the trial, appear as a witness, does not automatically make his prior statements admissible. *See generally* Fed.R. Evid. 801(d)(1)(B); *United States v. Pedroza*, 750 F.2d 187, 199–200 (2d Cir.1984), *cert. denied*, 479 U.S. 842, 107 S.Ct. 151, 93 L.Ed.2d 92 (1986). For strategic reasons, or as a trial tactic, counsel may choose not to object to the admission of a potential witness's prior statements. Indeed, in this case, May's counsel was herself prepared to elicit testimony from Beltrani as to certain aspects of Charles's statement. Such tactical decisions cannot, however, absent extraordinary circumstances, constitute cause to excuse a procedural default. *See Murray v. Carrier*, 477 U.S. at 488, 106 S.Ct. at 2645.

Even if May could demonstrate cause for his default, he certainly cannot show that he was prejudiced by the government's direct examination of Officer Beltrani. No statement made by Charles was adduced on direct. Beltrani only testified that Charles had made *a* statement, without specifying its content, and that certain actions were taken by the police thereafter. Such testimony is not hearsay because nothing has been offered for its truth. Limited facts were adduced simply sufficient to explain why agents took certain steps. *E.g., United States v. Freeman*, 816 F.2d 558, 563 (10th Cir.1987) (testimony relative to discussions with informant admitted to explain preparations and steps in government investigation and not to prove truth of matter asserted does not constitute hearsay); *United States v. Love*, 767 F.2d 1052, 1063–64 (4th Cir.1985) (fellow DEA agent's statements regarding investigation are not hearsay), *cert. denied*, 474 U.S. 1081, 106 S.Ct. 848, 849, 88 L.Ed.2d 890 (1986); *United States v. Garza*, 754 F.2d 1202, 1206 (5th Cir.1985) (statements of complainants offered to explain arrests are not hearsay). Certainly had defendant wished to have the jury specifically instructed as to the limited purpose for which the evidence was received, it would have been easy enough to request such a charge.

It was, of course, May's own counsel who then went on to inquire of Officer Beltrani as to whether certain names had been given in the statement. Only after the defense opened the door as to the content of the statement did the government on redirect have the witness testify to exactly which names Charles had given, *i.e.*, those of Hamilton and May. Given counsel's introduction of the issue into the case and the fact that, even on redirect, the jury did not hear what Charles said about Hamilton and May, only that he had identified them and therefore prompted the police to take further action, the court finds insufficient prejudice to defendant to support his petition.

### C. *Cross–Examination of the Defendants*

■ May contends that by cross-examining him while referring to a document, the prosecution impermissibly put before the jury the post-arrest statement of Peter Charles without affording him his right to confront Charles.

The prosecution does not dispute that the basis for its detailed questions to both defendants as to particulars about the crime derived from Charles. Indeed, the government must have a "good faith basis for questioning that alleges adverse facts." *United States v. Peterson*, 808 F.2d 969, 978 (2d Cir.1987) (quoting *United States v. Katsougrakis*, 715 F.2d 769, 779 (2d Cir. 1983), *cert. denied*, 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984)). This court does not, however, understand this principle to require, as a matter of constitutional law, that the prosecutor must be prepared to prove the adverse fact if a witness denies it. *Contra United States v. Silverstein*, 737 F.2d 864, 867–68 (10th Cir.1984). Due process can be adequately safeguarded through instructions, such as those given repeatedly throughout the May/Hamilton trial, that facts contained in the questions posed by counsel are not evidence unless adopted by a witness, and by the opportunity afforded counsel to excoriate an adversary who implies facts that are then not proved.

The court is, moreover, unpersuaded from its review of the entire trial transcript that the jury would have immediately assumed that the prosecutor's questions were, in fact, a verbatim account of Charles's statement. On November 20, 1979, the jury heard from Beltrani that Charles had made a statement about the homicide. It was not until November 23, 1979 when Hamilton was cross-examined, and not until November 26, 1979 when May was cross-examined, that the jury heard the questions now at issue. Most of the facts contained in the questions duplicated those provided by various eyewitnesses, for example, the fact that the robbers were putting money in hats or ski masks, the fact that May was armed with two guns and standing by the door, the fact that the three men got into a getaway car. The only significant fact contained in a question that had not been testified to by any of the other witnesses was May's purported statement to Charles that he had shot Miller because he had himself had a brother killed in a robbery. The court hardly thinks it was ideal for the prosecution to frame this question as it did, but if the jury was inclined to speculate as to the source of the facts contained therein or to consider them as evidence in the case, this court is persuaded that such risks were satisfactorily minimized by the trial court's instructions that questions do not constitute evidence (given repeatedly throughout the trial) and that no inferences should be drawn from the fact that lawyers refer to documents when they pose questions. In short, this court concludes that no hearsay statements of Peter Charles were "admitted as substantive evidence" against the defendant May. *See generally Tennessee v. Street*, 471 U.S. 409, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985) (co-defendant's confession admitted to rebut claim of coercion and not for truth).

The court further observes that petitioner's prejudice argument loses much of its force in light of the decision made shortly after his own cross-examination to rest without so much as speaking to Peter Charles, although the court was apparently prepared to stand in recess until Charles

was produced. It is, of course, the government that bears the burden of calling witnesses—or of demonstrating their unavailability—when relying on hearsay. But a defendant who himself makes the calculated decision that the risks of calling a potential witness outweigh the benefits certainly undermines his ability to complain that the witness was not available to him. *See generally Reardon v. Manson*, 806 F.2d 39, 42–43 (2d Cir.1986), *cert. denied*, 481 U.S. 1020, 107 S.Ct. 1903, 95 L.Ed.2d 509 (1987) (defendant not denied right to confront chemists whose analysis supported expert's opinion given their availability to be called as his witnesses).

2. *Withholding of Brady Material*

May complains that the prosecutor impermissibly withheld material that could have been used to impeach the credibility of Officer Frank Beltrani, namely that he was then the subject of a corruption investigation. *See Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *accord Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

The government raises a serious question as to whether it can properly be found to have been in possession of the proposed impeachment material. "Clearly the government cannot be required to produce that which it does not control and it never possessed or inspected." *Morgan v. Salamack*, 735 F.2d 354, 358 (2d Cir.1984) (quoting *United States v. Canniff*, 521 F.2d 565, 573 (2d Cir.1975), *cert. denied*, 423 U.S. 1059, 96 S.Ct. 796, 46 L.Ed.2d 650 (1976)).

The record before this court demonstrates that the investigation that led to the indictment of Frank Beltrani was conducted by the Office of the Special Prosecutor and not the Kings County District Attorney. The Office of the Special Prosecutor was created by executive order for the express purpose of investigating public corruption. *See* Exec. Order No. 43, 9 NYCRR 3.43, *cited in In the Matter of Hennessy*, 48 N.Y.2d 863, 865, 424 N.Y.S. 2d 352, 353, 400 N.E.2d 294, 295 (1979). Common sense dictates that considerable independence must exist between an office investigating complaints that police officers may have breached their public trust and an office that works closely with the police in the day to day enforcement of the criminal laws. Thus, this court does not find that any and all potentially impeaching material in the possession of the Special Prosecutor's Office is automatically inferred to be in the possession of every district attorney in the state. *United States v. Quinn*, 445 F.2d 940, 943–44 (2d Cir.), *cert. denied*, 404 U.S. 850, 92 S.Ct. 87, 30 L.Ed.2d 90 (1971) (U.S. Attorney in Southern District of New York not charged with knowledge of sealed indictment in Southern District of Florida against principal government witness); *accord Pina v. Henderson*, 752 F.2d 47, 49 (2d Cir.1985) (parole officer's knowledge of statement exculpating defendant not imputed to prosecutor). *United States v. Morell*, 524 F.2d 550, 555 (2d Cir.1975), relied on by petitioner, is not to the contrary since: (1) the Special Prosecutor was not, in this case, acting as an "arm" of the District Attorney; and (2) petitioner has failed to demonstrate that Beltrani himself knew that he was a target of a corruption investigation. Indeed, Howard Newman's affidavit is to the contrary.

In this case, a question has been raised as to whether the Special Prosecutor did share some relevant *Giglio* material with the Kings County District Attorney's Office when, in June or July, 1979, he sought access to Beltrani's grand jury testimony in another case and revealed that his purpose was to pursue an allegation of perjury. Assuming that information obtained by an Assistant District Attorney in the Grand Jury Bureau is imputable to another Assistant District Attorney in the same office, petitioner has failed to establish how a hearsay allegation of perjury, as opposed to actual evidence of perjury, constitutes *Giglio* material. At most, the defense might have been able to ask Beltrani if it were true that he ran a bodega when he was presumably on duty. If the officer denied the allegation, counsel could not offer extrinsic proof on such a collateral matter. Even if he admitted it, however, this court does not think such conduct would

have undermined the officer's credibility on the issue of having seen May, Hamilton and Charles together, much less created a reasonable doubt in the minds of jurors who had heard from four eyewitnesses to the murder.

■ In short, this court finds that even if any *Brady* material was withheld with respect to the investigation of Officer Beltrani, any ensuing error was harmless because, in light of overwhelming evidence of guilt, there simply was no "reasonable probability" that collateral impeachment of Beltrani would have resulted in a different verdict. *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985); *Payne v. LeFevre*, 825 F.2d 702, 707 (2d Cir.), *cert. denied*, — U.S. ——, 108 S.Ct. 508, 98 L.Ed.2d 506 (1987).

May seeks to minimize the overwhelming evidence against him by attacking the reliability of the eye witnesses. His argument that eye witness testimony is often suspect is undermined in this case: (1) by the number of eyewitnesses; (2) by the lengthy opportunity each had to view the robbers (in short, this was not a split-second purse snatching); (3) by the certainty of the identifications (which comes through even on a review court's reading of the cold record); and (4) by the jury's willingness to credit the testimony beyond a reasonable doubt.

May argues that the credibility of each of the four eye witnesses was suspect. He points out that James Mack had a ten-year old conviction for numbers and admitted lying about his age when he enlisted in the military in World War II. Moreover, he had failed to identify either defendant when he saw them in a line-up. His in-court identification apparently came as a surprise to all parties. James Funderburk had identified the defendants prior to trial. He admitted, however, to the commission of a number of armed robberies in the 1940's, as well as to the murder of his girlfriend in 1954. No criminal conduct in the twenty-five years prior to the Miller

murder was adduced. Mack Murphy testified to no criminal record, but admitted supporting himself exclusively through gambling. Donald Payton, the Housing Police Officer whose gun was taken during the robbery, admitted that he initially falsely reported his gun as stolen in his apartment building because of his embarrassment at having participated in illegal gambling. On the afternoon of January 17, 1979, however, he called the Police Department's Internal Affairs Division and thereafter gave a truthful accounting of the events at the social club. Later that day, Payton was told to report to the 77th Precinct where he identified as his the gun seized in the arrest of Brison Hamilton.

Admittedly, the habitues of Brooklyn social clubs may not be prominent candidates for sainthood. But in this case, counsel was unable to show that their criminal backgrounds provided them with any motive to lie about the perpetrators of a crime that they all witnessed. Counsel had ample opportunity to elicit and argue whatever evidence was relevant to past opportunities to identify the defendants. The jury was obviously unpersuaded. Similarly, although much was made of Donald Payton's less-than-exemplary conduct on the night of the murder, and of his friendship with various of the other eyewitnesses, the jury rejected the suggestion that they all falsely identified the defendants simply to help Payton with his own problems.[5]

By contrast to the strong direct evidence of guilt, the Beltrani impeachment material would only have provided a collateral attack on the credibility of a witness who provided testimony of minimal importance to the case. Although May testified to not even knowing his fellow defendants, whereas Beltrani reported seeing them together prior to the crime,[6] this discrepancy was never particularly significant. May admitted being at the social club on the night of the murder. Indeed, he admitted being within inches of Miller when he died.

---

**5.** Payton had already been suspended at the time of trial and there is no suggestion that the degree of discipline imposed hinged in any way on his trial testimony.

**6.** Not insignificantly, Charles testified at his trial to having known both May and Hamilton from the neighborhood.

The critical dispute at trial was thus between his rather implausible testimony that he just happened to be behind Miller, waiting to collect money won on a bet, when the man was senselessly shot dead, and that of the eyewitnesses that it was May who actually fired the fatal shots. Having reviewed the entire trial transcript, the court finds no reasonable probability that the verdict in this case would have been any different had counsel had access to and been able to cross-examine Beltrani on the facts that ultimately led to his indictment.

## CONCLUSION

The court finds that Larry May was not denied his right to confront Peter Charles. It further finds that, if any *Brady* material was withheld that would have allowed him to impeach the credibility of Frank Beltrani, the error was harmless. Accordingly, the petition for a writ of habeas corpus is denied. A certificate of probable cause is, however, granted.

SO ORDERED.