**Carl PAYNE, Petitioner-Appellant,**

v.

**Eugene S. LeFEVRE, Superintendent of Clinton Correctional Facility, Respondent-Appellee.**

**No. 987, Docket 86–2228.**

United States Court of Appeals, Second Circuit.

Argued April 7, 1987.

Decided Aug. 4, 1987.

Jonathan J. Silbermann, New York City, for petitioner-appellant.

Jessica Hecht, Asst. Dist. Atty., Kings County, Brooklyn, N.Y. (Elizabeth Holtzman, Dist. Atty., Barbara D. Underwood, Shulamit Rosenblum, Asst. Dist. Attys., Kings County, Brooklyn, N.Y., of counsel), for respondent-appellee.

Before LUMBARD, OAKES and CARDAMONE, Circuit Judges.

LUMBARD, Circuit Judge:

Carl Payne appeals from an order of the United States District Court for the Eastern District (McLaughlin, J.), dated April 24, 1986, denying his petition for a writ of habeas corpus. On March 30, 1978, Payne was convicted by a jury in New York Supreme Court, Kings County of murder in the first degree, sale of a controlled substance in the third degree, and possession of a controlled substance in the third and fifth degrees. He was subsequently sentenced to a term of twenty-five years to life imprisonment on the murder count and concurrent terms ranging from zero years to life on the other counts. The Appellate Division unanimously affirmed Payne's convictions without opinion, 70 A.D.2d 1063, 417 N.Y.S.2d 153 (2d Dept.1979), as did the Court of Appeals by published opinion, 52 N.Y.2d 743, 436 N.Y.S.2d 271, 417 N.E.2d 564 (1980).

As he had in the state appellate courts, Payne, in his habeas petition, maintains that he was denied a fair trial by the prosecutor's failure to provide him with a police report recording a prosecution witness's prior inconsistent statement while that witness was testifying and by the trial court's subsequent preclusion of cross-examination about the report when the officer who had written it was testifying. Payne also contends that the trial court—by twice charging the jury that there was a "fundamental rule of evidence that a person is presumed to intend the natural consequences of his act"—shifted to him the burden of proof on the issue of intent for the killing, in violation of his right to due process under *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). In reject-ing these claims, the district court found that the untimely disclosed document was duplicative of other material containing the same inconsistent statement and that the jury instructions on the whole were constitutional because they contained language which ameliorated the alleged *Sandstrom* violation. We affirm.

I.

A. *Background*

On the afternoon of August 29, 1977, New York City detective Joseph Taylor and his partner, police officer Roy DeSetto, went to Payne's apartment at 14 Linden Street in Brooklyn in response to a radio report about a man there with a gun. Taylor knocked on the apartment door, announced that the police were present, and was told to wait a moment. The door then partially opened. Peering through the threshold, Taylor was struck down by a close-range shotgun blast to his chest and later died after suffering massive internal hemorrhaging from the shotgun wounds.

DeSetto immediately moved to return fire. He pointed his service revolver through the partially opened door and, in a back-and-forth motion, blindly emptied six shots into the apartment. He then swung the door open, looked inside the small one-room apartment and saw two men escaping through a window and another, crouching behind a bed, moving toward it. Picking up his dying partner's revolver, DeSetto fired six more shots. He saw one of the men flinch, as if hit, as he leapt out the window.

When the shooting ceased and police reinforcements arrived, they discovered one Louis Belgrave on the apartment floor, mortally wounded. A short while later, following a trail of blood leading from an alleyway behind Payne's apartment building, police found Payne, who was bleeding from his foot, in a nearby abandoned basement apartment and arrested him. A search of Payne's apartment disclosed a quantity of cocaine, a handgun, a shotgun

and a bill of sale listing Payne as its purchaser.

Payne was subsequently charged with murder in the first and second degrees for officer Taylor's death, N.Y.Penal Law §§ 125.27, 125.25 (McKinney 1975); two counts of possession of a weapon in the fourth degree, arising from discovery of the handgun and shotgun, N.Y.Penal Law § 265.01; and several counts of sale and possession of a controlled substance, the cocaine found in Payne's apartment, N.Y. Penal Law §§ 220.39, 220.16, 220.06.

At Payne's trial, the State called two men who were in Payne's apartment with Payne and Belgrave at the time of the shooting, Ewan Brown and Roy Canton. They testified that they had gone to the apartment several hours before the incident to purchase cocaine from Payne. Shortly after snorting a portion of the purchased narcotic, they heard Taylor's knock. Payne got up from a chair, picked up a nearby handgun and asked "who is it." When Taylor responded,[1] Payne told the officer to wait and exchanged the handgun for a shotgun, which he retrieved from his closet. Payne then pumped the shotgun as he walked to the apartment door and pushed the door open with the barrel of the gun. Brown and Canton next heard a loud blast and saw Payne drop the shotgun. As officer DeSetto began to fire, Canton jumped through a window to a roof below, followed by Payne. Brown, who stayed in the apartment, testified that Belgrave, who until then had been lying inertly on a bed, attempted to leap out the window as well but was hit twice as he moved toward it.

Payne took the stand as the only witness in his defense. While conceding on both direct and cross-examination that he owned the shotgun which had been used against Taylor, Payne maintained that it was Belgrave who had shot Taylor. Payne testified that after he heard the knock on his apartment door and asked who it was, Belgrave motioned not to make any noise,

volunteered to answer the door, and picked up Payne's shotgun as he went toward it. According to Payne, Belgrave, facing the door, then pointed the gun straight ahead and fired.

On direct examination, in the course of relating his personal history leading up to the incident, Payne stated that while on a visit in Texas in July 1977, he had shot and killed a man after the man stabbed him eight times during a dispute over a bicycle. He also denied selling cocaine to Brown and Canton, stating that the cocaine in his room had been placed there by a neighbor while Payne had been away and that Brown and Canton had simply helped themselves to it. Payne further testified that he had not partaken of the cocaine but had smoked marijuana with his guests at some point before the shooting.

In her summation to the jury, Payne's counsel argued that there was no reason to disbelieve Payne's version of the shooting, mentioning that Payne, who had no prior convictions, had been candid in fully relating the details of his life. Counsel admonished the jury to "[r]emember the physical facts of this case," contending, *inter alia,* that the size and configuration of Payne's apartment, the number and position of Belgrave's bullet wound and his position in the apartment demonstrated that Belgrave was Taylor's killer.

B. *Untimely Disclosure of the Police Report*

During the course of trial, officer DeSetto, called by the State, testified on direct-examination that in his second series of shots into Payne's apartment he aimed four shots at Payne and Canton as they attempted to escape out of the window and two at Belgrave, who was behind the bed. Before beginning her cross-examination, defense counsel requested that the prosecution turn over any reports prepared by DeSetto relating to the shooting, as well as all materi-

1. Testifying for the State, officer DeSetto stated that Taylor announced "police" in response to Payne's inquiry. Both Brown and Canton, however, testified that they heard officer Taylor, whose name was Joseph, say "Joe", as did Payne, when he testified. We discuss the significance of this discrepancy in testimony, which was not alluded to at trial, below in addressing Payne's *Sandstrom* claim.

al under *People v. Rosario*, 9 N.Y.2d 286, 213 N.Y.S.2d 448, 173 N.E.2d 881 (1961). In *Rosario*, the Court of Appeals held that the prosecution was required to turn over its witness' prior statements following direct examination so that they may be used by the defense for impeachment purposes in cross-examination. *People v. Poole*, 48 N.Y.2d 144, 148, 422 N.Y.S.2d 5, 7, 397 N.E.2d 697, 699 (1979).[2]

Complying with the request, the prosecution provided defense counsel, *inter alia*, with copies of DeSetto's grand jury testimony and a written statement DeSetto had given to an assistant district attorney. Using these materials, Payne's counsel elicited on cross-examination that DeSetto had not specifically mentioned firing these last two shots at Belgrave either when he was interviewed by an assistant district attorney or when he testified before the grand jury.

The prosecution failed, at that time, to turn over a report prepared by detective Walter Clark of an interview which he had conducted with DeSetto shortly after the incident. The report was disclosed only after Clark, who had conducted an investigation of the incident, had completed his direct testimony for the State and Payne's counsel had made a similar *Rosario* request with respect to his testimony. Clark's report recorded DeSetto's statement that he fired his partner's revolver "six times at two male blacks fleeing out the window." When defense counsel attempted to ask Clark about the contents of his report, however, the trial court sustained the prosecution's objection to such questions on hearsay grounds and foreclos-

ed defense counsel from examining Clark about the report despite counsel's protestations that the prosecutor had failed to disclose the report while DeSetto had been on the stand, as she had requested. Choosing neither to proffer the report under any of the hearsay exceptions nor to recall DeSetto to question him about it, Payne's counsel then dropped the matter.

## C. *The Challenged Jury Instructions*

As stated above, the indictment charged Payne with first and second degree murder for fatally shooting officer Taylor. At Payne's request, the trial judge also charged the jury with respect to the lesser included offense of manslaughter in the first · degree. N.Y.Penal Law § 125.20 (McKinney 1975). In giving the charge, he read and explained to the jurors the statutory elements for each of these crimes,[3] instructing them that the prosecution had the burden of proving each element beyond a reasonable doubt and that, until it did, Payne was to be presumed innocent.

Turning to the element of intent generally, the trial judge stated that "[i]ntent is the operation of a person's mind whereby he aims to obtain the desired and natural consequences ... of his act" and could be proven by words, acts or a combination of both; he gave the jury simple examples of each method.

The judge then emphasized that intent occasionally must be proven by a defendant's actions alone but that: "[i]t is for you [the jury] to infer from all the evidence in the case whether or not the defendant, if you find that [he] committed the act charged in the indictment," did so with the

---

**2.** The rule has since been codified in N.Y.Crim. Proc.Law § 240.45 (McKinney 1982 & Supp. 1986). This provision, which became effective after Payne's trial, does not require defendant to make a request before receiving *Rosario* material and obligates the prosecution to turn over such materials, in a jury trial, before proceeding with its opening and, in a bench trial, before submitting evidence. *Cf.* N.Y.Crim.Proc.Law § 240.44.

**3.** In New York, a person is guilty of murder in the second degree when, *inter alia*, he intends to and does cause the death of another person. N.Y.Penal Law § 125.25. First degree murder

requires proof of the same but also requires the prosecution to establish, under the circumstances of this case, that the victim was a police officer, as defined by statute, N.Y.Crim. Proc.Law § 1.20(34) (McKinney 1981), "who was killed in the course of performing his official duties" and that the defendant should have reasonably known that the victim was a police officer. N.Y.Penal Law § 125.27(1)(a)(i).

First degree manslaughter is established, *inter alia*, when a defendant is shown to have caused the death of another, while acting with the intent to do serious physical injury to him or a third person. N.Y.Penal Law § 125.20.

requisite degree of intent for the specific offense charged. Closing his discussion of intent, the judge said:

*It is a fundamental rule of evidence that a person is presumed to intend the natural consequences of his act* unless there is evidence that the act was done under circumstances or conditions which preclude the existence of such intent.

(emphasis added).

Following roughly ten hours of deliberations, the jury recessed. The next morning, the jury requested a supplemental charge "in laymen's terms of 'intent' as defined in murder in the first degree." Obliging the request, the trial judge reread the statutory definition and reiterated that intent could be proven by words, deeds or a combination, again providing examples to illustrate.[4]

After his last example, the trial judge turned to the case at hand and stated as follows:

It is for you to infer from all the evidence whether or not if you believe that the defendant picked up that shotgun and he heard the knock on the door, if that is your conclusion beyond a reasonable doubt, and he aimed it in the direction of the door, he pulled the trigger and it went off, you have a right to infer, that's your job, if you wish, if you believe he is the one who did it, that he intended to do that, that was his aim, that was his purpose. He didn't have to say a word but you have a right to infer, if that's your conclusion. I'm not telling you what to do. That's the right that you have. There is no requirement that he use words to express his intent. If you believe that, according to the testimony that with the butt of the shotgun he opened the door and pushed it aside and then whoever was out there would

be the recipient of the blast, if it happened to be a detective and he knew it was a detective or a police officer, from all of the circumstances and facts which you believe from this witness stand, then you have a right to infer that he intended to do it.

*The law says that it is a fundamental rule of evidence that a person is presumed to intend the natural consequences of his act,* unless the act was done under circumstances or conditions which preclude the existence of such intent *and that you have to find from the evidence, if you do.*

So, make your decision with respect to the answer that you asked me to give you, based upon the evidence that you recall, that you believe, whether or not this defendant intended to and did knowing or had reason to know that the person on the other side of the door, when the door was opened from within, not from without, intended to do what under the law he was charged with doing. That's your job.

(emphasis added).

After hearing this supplemental charge, the jury deliberated seven more hours before convicting Payne of first degree murder, criminal possession of the shotgun, and the narcotics counts.[5]

## II.

We briefly address Payne's claim concerning the prosecution's belated disclosure of detective Clark's police report. Relying on *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and its progeny, Payne argues that the failure of the prosecutor to turn over Clark's report while DeSetto was testifying, combined with the trial court's decision to foreclose cross-examination of Clark about it, de-

---

**4.** The trial judge provided the following examples:

A says to B I'm going to punch you right in the nose. He's expressing his intent to do it ... and sometimes a person goes over to another, bing, right in the jaw with his right fist and never said a word.... You take for example a person puts his hand in another person's pocket in a department

store. He isn't saying I intend to steal that person's money....

**5.** The jury acquitted Payne of criminal possession of the handgun, and the trial court dismissed Payne's conviction of criminal possession of the shotgun, finding that this weapons count was included in the first degree murder conviction.

prived him of due process and violated his Sixth Amendment right to confront witnesses. In *Brady*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." 373 U.S. at 87, 83 S.Ct. at 1197.

Payne argues that *Brady* applies because Clark's report was critical to his defense: Like DeSetto's other prior descriptions of his actions, the report, by making no mention that DeSetto had aimed two shots at Belgrave, tended to suggest that Belgrave was killed by DeSetto's first, indiscriminate series of shots; if so, Payne contends, then it was likely that Belgrave, who had been hit three-to-five times, was in the direct path of the apartment doorway, and so he was Taylor's killer and not Payne.

█ The New York Court of Appeals, in rejecting a similar claim on Payne's appeal, held that Clark's report should have been disclosed while DeSetto was testifying, as a matter of state law. However, like the district court subsequently, it concluded that the report was duplicative of material which Payne's trial counsel already had in her possession and had actually used in cross-examining DeSetto. We agree.

█ With the materials provided, Payne's counsel twice established the very point she would have made with Clark's report. While the report would have yielded some incremental impeachment value, especially since Clark interviewed DeSetto on the day of the shooting, its belated disclosure can hardly be said to have raised a *Brady* violation. For such to occur, there must be "a reasonable probability"— one "sufficient to undermine confidence in the outcome"—that the jury would have ·resolved Payne's case differently had the prosecution disclosed the report on a timely basis. *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985); *United States v. Srulowitz*, 785 F.2d 382, 388 (2d Cir.1986). We cannot so conclude, especially in light of Payne's counsel's failure to recall DeSetto to question him about it or, alternatively, to prof-

fer the report under one of the hearsay exceptions. *See United States v. Menghi*, 641 F.2d 72, 75 (2d Cir.), *cert. denied*, 451 U.S. 975, 101 S.Ct. 2058, 68 L.Ed.2d 356 (1981).

### III.

Payne's challenge to the jury instructions raises more troubling questions. In *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), the Supreme Court held that a jury instruction that "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts" violates a defendant's right to due process because it either removes intent from the case completely or tends to shift to the defendant the burden of proof on the issue. As the district court properly recognized here, the trial court twice instructed the jurors that they could presume intent from Payne's conduct in language virtually identical to that repudiated in *Sandstrom*.

That "a specific portion of a jury charge, considered in isolation, could reasonably have been understood as creating a presumption that relieves the State of its burden of persuasion on an element of an offense" does not end the inquiry, however. *Francis v. Franklin*, 471 U.S. 307, 315, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985). In *Francis*, the Supreme Court made clear that permissive inferences do not implicate the *Sandstrom* rule, provided they are rooted in reason and common sense. Accordingly, as the *Francis* Court reaffirmed, a reviewing court must look to the charge as a whole to see if there were other instructions capable of explaining "the particular infirm language to the extent that a reasonable juror could not have considered the charge to have created an unconstitutional presumption." *Francis, supra*, 471 U.S. at 315, 105 S.Ct. at 1972.

Looking first to the language immediately surrounding the offending passages, the district court observed that in both the main and supplemental charges, the suspect phrase—"[t]he law says that it is a fundamental rule of evidence that a person

is presumed to intend the natural consequences of his act"—was juxtaposed by a qualifier—"unless the act was done under circumstances or conditions which preclude the existence of such intent." Enlarging its focus, the district court also found that "each time the presumption charge was given, it was in the midst of language stressing the fact that intent was to be determined by the jury upon consideration of all the circumstances in the case." Accordingly, the district court concluded that both charges, seen in their entirety, merely instructed the jury that, if it found that Payne shot officer Taylor, it might infer that he intended to do so and that he similarly intended that act's "consequences."

On appeal, Payne primarily focuses on the burden-shifting effect the presumptive language had in the trial judge's supplemental charge. Payne points out that there, unlike in the main charge, the clause —"unless there is evidence that the act was done under circumstances or conditions which preclude the existence of such intent"—was immediately followed by the trial judge's statement—"and that you have to find from the evidence, if you do." According to Payne, this admonition "totally negated" the ameloriative effect of the preceding phrase and, more importantly, impermissibly suggested that he was required to produce evidence necessary to "preclude" the presumption. Pointing to the absence in the supplemental charge of general instructions reminding the jury of the prosecution's burden of proving guilt beyond a reasonable doubt and of Payne's presumption of innocence, Payne also argues that the failure to issue these reminders, combined with the inclusion of specific examples by which the trial judge illustrated the presumption, exacerbated the offending language's burden-shifting effects in the supplemental charge.

■ We find it unnecessary to pass on Payne's challenge to the district court's analysis of the jury charges, as our review of the evidence convinces us that the predicate facts in this case conclusively established intent. "[N]o rational jury could [have found] that" Payne picked up his shotgun, pumped it, used it to push his apartment door open and then pulled the trigger at point-blank range but did not intend to fire the shots. *Rose v. Clark,* —— U.S. ——, 106 S.Ct. 3101, 3108, 92 L.Ed.2d 460 (1986). Obviously, the jury was convinced that Payne fired the shots that killed Taylor, and Payne offered nothing at trial to suggest that his actions could have diverged from his intentions: His sole defense was that another man shot officer Taylor and that the physical facts of this case proved the assertion. Accordingly, we hold that any *Sandstrom* error which infected the challenged jury instructions was harmless beyond a reasonable doubt.[6]

Payne's argument that the instructions on intent could have prejudiced the jury in its consideration of the manslaughter charge does not persuade us. The difference in the intent element for first degree murder and manslaughter resides in the object of the intended act—to seriously injure or to kill. The challenged jury instructions spoke to the issue of intent generally, however, and did no more than guide the jury in considering whether the shooting had been intended; failing to indicate what type of "consequences" the jury could (or should) have presumed from this conduct, the offending language could have neither helped nor hindered the jury in resolving whether Payne's intended shots were meant to kill the officer or just wound him.

This aside, we cannot conceive how the jury, after finding that Payne fired the shotgun into his victim's chest at point-blank range, rationally could have concluded other than that Payne intended to kill

---

6. For this reason, we also find it unnecessary to pass on the State's argument that Payne is procedurally barred from raising the *Sandstrom* claim because he failed to object to the jury instructions at trial, as required by New York's contemporaneous objection rule, N.Y.Crim. Proc.Law § 470.05(2) (McKinney 1983 & Supp.

1987). *See Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) (setting forth the doctrine on independent and adequate state bars to federal habeas review); *People v. Thomas,* 50 N.Y.2d 467, 429 N.Y.S.2d 584, 407 N.E.2d 430 (1980) (applying the contemporaneous objection rule to alleged *Sandstrom* errors).

officer Taylor—given Payne's deliberate choice of this powerful and notoriously indiscriminate weapon.

Nor are we convinced by Payne's other argument, that the jury could have believed that he was fearful of a man named "Joe" and so may have fired the shots out of fright when he "heard" Taylor announce himself by that name. The argument is a red-herring. At trial, neither Payne nor his counsel suggested that he was afraid of a man named "Joe." Only on appeal, did Payne suggest that the "Joe" he heard knock on his door that day could have been the brother of the man he had recently killed in Texas. Indeed, the suggestion is drawn from a series of isolated questions posed by the prosecution on cross-examination. Payne's response to them makes clear that the man whom Payne could have feared—the brother of the man whom Payne had recently killed—Payne knew by the name of "Joseph," not "Joe." [7]

Even if the factual predicates of this belated defense were borne out by the evidence, the jury could hardly have been affected in its consideration of them. Taylor was in uniform when shot, and, as other evidence shows, when Payne opened his apartment door with the shotgun barrel, he would have immediately recognized that he was being confronted by a police officer, not the vengeful brother of a prior victim.

Finally, there is no dispute that Payne was competently represented by counsel and enjoyed the benefit of an impartial judge and jury. Accordingly, we find that the challenged instructions, even if deemed violative of *Sandstrom*, were harmless beyond a reasonable doubt. *Chapman v.*

---

*California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

Affirmed.

OAKES, Circuit Judge (concurring):

I concur in the result, not with enthusiasm, but because *Rose v. Clark*, —— U.S. ——, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986), compels it.

---

7. Payne responded to the prosecutor's questions as follows:

    Q. Did you hear a clear voice outside say police?
    A. No.
    Q. What did you hear?
    A. Joe.
    Q. *Do you know a Joe?*
    A. No.
    Q. *Didn't know anybody named Joe?*
    A. No.
    Q. How about the guy you killed, did you know his brother Joe?

    A. Joseph.
    Q. What?
    A. Joseph.
    Q. That was the brother of the guy you killed, is that right?
    A. That's correct.
    Q. You called him Joseph?
    A. That's correct.
    Q. *You know Joe and Joseph could be the same thing, right?*
    A. *It wouldn't be. Joe is Joe and Joseph is Joseph.*
    Q. So, you heard Joe, right?
    A. That's correct.
(emphasis added).