UNITED STATES of America, Appellee,

v.

Latik ALLAH, aka Christopher Hamilton, aka "Lye"; William Hamilton, aka "Star", aka "Starpre", Defendants–Appellants.

Nos. 1583, 1584, Docket 96–1620(L), 96–1642.

United States Court of Appeals, Second Circuit.

Argued June 5, 1997.

Decided Nov. 12, 1997.

Walsh, Guy Petrillo, Asst. U.S. Atty., New York City, on the brief), for Appellee.

Barry D. Leiwant, New York City (The Legal Aid Society, Federal Defender Division, Appeals Bureau, New York City, on the brief), for Defendant–Appellant Allah.

Susan C. Wolfe, New York City (Hoffman Pollok & Pickholz, New York City, on the brief), for Defendant–Appellant Hamilton.

Before: NEWMAN, KEARSE and CALABRESI, Circuit Judges.

KEARSE, Circuit Judge:

Defendants Latik Allah and William Hamilton, who are brothers, appeal from judgments entered in the United States District Court for the Southern District of New York, following a jury trial before Robert L. Carter, *Judge*, convicting each on one count of willfully dealing in firearms without a license, in violation of 18 U.S.C. §§ 922(a)(1)(A) and 924(a)(1)(D) (1994), and one count of conspiring to do so, in violation of 18 U.S.C. § 371 (1994). Allah was also convicted on one count of possessing firearms and ammunition as a previously convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (1994). Allah and Hamilton were sentenced principally to prison terms of 92 and 51 months, respectively, with each term of imprisonment to be followed by a three-year period of supervised release. On appeal, defendants contend chiefly that the district court gave the jury erroneous instructions with respect to willfulness, intent, and the definition of a firearms "dealer." Finding no basis for reversal, we affirm the convictions.

## I. BACKGROUND

The events leading to the present prosecution concerned defendants' sale of seven guns in five transactions during a two-month period in 1995 to New York City Police Detective George Rosado, who was working undercover as an illegal firearms dealer. Much of the evidence at trial consisted of the testimony of Rosado and another officer who worked in the undercover operation, as well as tape recordings made by Rosado of his telephone conversations with Allah or Hamilton. The following account is drawn from that evi-

Ira M. Feinberg, Asst. U.S. Atty., New York City (Mary Jo White, U.S. Atty. for the Southern District of New York, Jean T.

dence, taken in the light most favorable to the government.

Following receipt by the police of a tip from a confidential informant as to illegal firearms sales, Rosado arranged to meet Hamilton on June 22, 1995, near a barber shop where Hamilton worked, to discuss the sale of two 9-millimeter semi-automatic pistols. At that meeting, which was conducted in Rosado's car, Hamilton said he had a "Tech" 9-millimeter pistol and a "Cat" 9-millimeter pistol that he would sell for $1,000 each. When Rosado agreed, Hamilton asked to see Rosado's money. After counting the money, Hamilton directed Rosado to drive to a new location. Upon their arrival, Rosado and Hamilton were approached by Allah, who after being introduced to Rosado by Hamilton, asked Rosado whether he had the money to complete a deal. When Rosado responded in the affirmative, Allah said it was "too hot" to conduct the transaction where they were, and he directed Rosado to meet him inside a nearby building. Rosado did so, and Hamilton remained outside, scanning the street.

Inside the building, Rosado and Allah were joined shortly by two men who posted themselves at the front door and on an interior staircase. Allah then produced a bag containing two pistols, which Rosado began to examine. The transaction was momentarily interrupted by a warning shouted from outside the building that "Five-O"—a term for the police, by reference to the television program *Hawaii Five-O*—were in the area. Allah left briefly to investigate, and after being assured that things were "cool," returned to complete the transaction. As agreed, Rosado paid $2,000 for the two pistols. Before they parted, Allah gave Rosado his beeper number, assuring Rosado that Allah could get any kind of gun Rosado wanted, including, various types of handguns, sawed-off shotguns, and assault rifles. Outside, as Rosado prepared to leave, he asked whether Hamilton wanted a ride back to the barber shop; Hamilton declined, saying, "not while you have those [guns] in the car."

On July 7, Rosado contacted Allah by means of the beeper number Allah had given him. The two discussed various types of guns that Allah might be able to sell Rosado,

and Rosado expressed interest in purchasing .380-caliber pistols. Allah told Rosado he was expecting a delivery of 15 such pistols, along with 10 9-millimeter guns, the following day. Rosado asked the price for 12 .380-caliber pistols, and Allah said he would give Rosado a discount for such a bulk purchase and would include free ammunition. Several days later, Rosado called Allah again to renew his inquiry about the .380-caliber guns. Allah said he had not received them as expected, but that he would call Rosado when they arrived.

On July 19, not having heard from Allah, Rosado telephoned Hamilton. After being told about the deal Rosado had been discussing with Allah, Hamilton said that Rosado should have contacted Hamilton first because he was the "middleman," and that it was his job "to make sure shit is legit, and ... the funds is [*sic*] produced" and to "make sure everything falls down the line." As to the .380-caliber pistols Rosado had discussed with Allah, Hamilton said, "we, we have something on that, that we 'posed to, um ... purchase"; but he said something had gone awry. Hamilton added, "[w]e still on hold about that," and that probably the reason Allah had not contacted Rosado about the .380-caliber guns was that the guns had not yet arrived. Hamilton explained, "we don't believe in half stepping, you know what I'm saying? If we suppose [*sic*] to make an exchange or get something, what's the use in calling you or whoever and it's not there yet." Rosado inquired whether Hamilton had 9-millimeter pistols available and if so at what price. Hamilton responded that he could get such guns and asked "how many do you want"; he stated that he would sell them to Rosado for $700 apiece, but would "automatically drop" the price if Rosado bought in bulk. Before the conversation ended, Hamilton gave Rosado his two beeper numbers and said, "anytime you ever want some or see what we got, just give me a beep and I, I'll take care of that."

On August 8, Rosado spoke with Allah, and over the next three weeks, they entered into four additional firearms transactions. The first three of these August transactions, involving the sale of a total of four firearms,

were carried out in the following manner. Allah and Rosado discussed by telephone the guns that Allah had available to sell, and Rosado agreed to purchase one or two of them. They then met in various locations specified by Allah, and Rosado paid Allah cash for the gun or guns.

During and after the third of these August transactions, Allah informed Rosado that he was being given "a hard time" about dealing with Rosado, by a partner who had become "paranoid" that Rosado was "Five–O." The partner was suspicious because Rosado declined to trade two guns previously sold to him by Allah for an Uzi 9–millimeter pistol; according to Allah, the partner believed that Rosado had refused that "good deal" because "a 'Five–Oh' [*sic*] can' t give a burner [*i.e.,* a gun] up.... They can't put a burner into the street." Rosado explained that he had refused the offer not because he was a policeman, but because he had already sold the two guns by the time the trade was offered. Any concerns on Allah's part were apparently allayed, because he promptly agreed to sell the Uzi to Rosado. Allah set a price of $1,500 and assured Rosado that he need not worry about the suspicions of the partner because Allah would handle the Uzi deal by himself, explaining that he, Allah, was willing to "take the chance."

For the ensuing transaction, Allah again directed Rosado to a location where the two could meet to complete the exchange. Upon meeting Rosado at that location, however, Allah said it was "too hot" to complete the sale where they were, and he redirected Rosado to the building in which the two had conducted their first transaction. After entering the building with Allah, Rosado was immediately frisked by two men, one of whom brandished a gun upon feeling something attached to Rosado's waistband, which turned out to be his beeper. When the two had finished frisking Rosado, one of them produced a bag containing the Uzi, and Rosado handed him the agreed $1,500.

The present prosecution was commenced in early 1996. Both Allah and Hamilton were charged with willfully dealing in firearms without a license, in violation of 18 U.S.C. § 922(a)(1)(A) and 18 U.S.C. § 2

(1994) (count two), and conspiring to do so, in violation of 18 U.S.C. § 371 (count one). In addition, Allah and Hamilton were charged with possessing firearms and ammunition as previously convicted felons, in violation of 18 U.S.C. §§ 922(g)(1) and 2 (counts five and six, respectively); and Allah was charged with two counts of transporting and receiving in interstate commerce two firearms with their serial numbers obliterated, in violation of 18 U.S.C. § 922(k) (1994) and 18 U.S.C. § 2 (counts three and four).

The jury found Allah and Hamilton guilty of willfully dealing in firearms without a license and of conspiring to do so; and it found Allah guilty of possessing a firearm and ammunition as a previously convicted felon. It acquitted Hamilton on the similar felon-in-possession count against him, and it acquitted Allah on the two remaining counts. Defendants were sentenced as indicated above. Judgments were entered accordingly, and these appeals followed.

## II. DISCUSSION

On appeal, defendants principally challenge the district court's instructions to the jury with respect to willfulness, intent, and the definition of firearms "dealer." In addition, they contend that the court dealt inadequately with the presumption of innocence; and Hamilton contends that the evidence was insufficient to support his convictions. Although the district court's instructions were not unflawed, we conclude that any error was harmless. We conclude that the evidence was ample to support the convictions.

### A. *The Instructions on Willfulness*

Section 922(a) makes it unlawful for any person other than a licensed dealer to "engage in the business of ... dealing in firearms." 18 U.S.C. § 922(a)(1)(A). Section 924 provides up to five years' imprisonment for any person who "willfully violates" § 922(a)(1)(A). 18 U.S.C. § 924(a)(1)(D). *Compare* 18 U.S.C. § 924(a)(1)(B) (providing same penalty for persons who "knowingly" violate certain other subsections of § 922). Defendants contend that they are entitled to a new trial on the grounds (1) that the dis-

trict court erred in refusing to give their requested instruction as to the meaning of "willfully"; (2) that to the extent that their requested instruction was contrary to the precedent of this Circuit established in *United States v. Collins,* 957 F.2d 72 (2d Cir.) ("*Collins*"), *cert. denied,* 504 U.S. 944, 112 S.Ct. 2285, 119 L.Ed.2d 210 (1992), *Collins* should be overruled; and (3) that, in any event, the instructions given by the district court did not conform to *Collins.* We reject all of these arguments.

### 1. *The Requested Instruction*

■ At trial, defendants asked the district court to instruct the jury that the term "willfully," as used in § 924(a)(1)(D) with respect to § 922(a)(1)(A), means that a defendant must have dealt in firearms with specific knowledge of the license requirement and with the specific intent to violate that precise requirement. Defendants contend that the court's rejection of that request was error. In light of the existing precedent in this Circuit, we disagree.

In *Collins,* we rejected virtually the identical argument. Collins had contended that, in order to prove that his unlicensed firearms dealing was willful, the government was required to show his specific knowledge of § 922(a)(1)(A) and the specific intent to violate that section. We disagreed, stating that "the element of willfulness now contained in § 922(a)(1) was meant to be read broadly to require only that the government prove that the defendant's conduct was knowing and purposeful and that the defendant intended to commit an act which the law forbids," 957 F.2d at 76, and that the government was not required to prove "more than just the defendant's general knowledge that he or she is violating the law," *id.* at 75.

*Collins's* interpretation of the willfulness element of §§ 922(a)(1)(A) and 924(a)(1)(D) as not requiring more than proof that the defendant knew generally that his conduct was unlawful has been followed in other cases in this Circuit, *see, e.g., United States v. Bryan,* 122 F.3d 90, 91–92 (2d Cir.1997) (per curiam) (affirming conviction for violation of § 922(a)(1) under *Collins* standard), *petition for cert. filed,* No. 96–8422 (April 1,

1997); *see also United States v. Ali,* 68 F.3d 1468, 1473 (2d Cir.1995) (construing willfulness under 18 U.S.C. § 922(e) in accordance with *Collins's* interpretation), *modified on other grounds,* 86 F.3d 275 (2d Cir.1996). *Collins* remains the law of the Circuit, *see generally United States v. Ianniello,* 808 F.2d 184, 190 (2d Cir.1986) ("This Court is bound by a decision of a prior panel unless and until its rationale is overruled, implicitly or expressly, by the Supreme Court or this court *en banc.*"), *cert. denied,* 483 U.S. 1006, 107 S.Ct. 3229, 97 L.Ed.2d 736 (1987), and the district court's refusal to give the instruction requested by defendants was therefore proper.

### 2. *The Effect of the Supreme Court's Decision in* Ratzlaf

Defendants also contend that the Supreme Court's decision in *Ratzlaf v. United States,* 510 U.S. 135, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994), which concerned the willfulness element of the offense of structuring financial transactions, implicitly overruled the rationale of *Collins.* They point out that in the wake of *Ratzlaf,* several other Courts of Appeals have disagreed with *Collins's* interpretation of the § 924(a)(1)(D) requirement of willfulness, *see, e.g., United States v. Obiechie,* 38 F.3d 309, 312–16 (7th Cir.1994); *United States v. Sanchez–Corcino,* 85 F.3d 549, 552–54 & n. 1 (11th Cir.1996); *see also United States v. Hayden,* 64 F.3d 126, 128–31 & n. 6 (3d Cir.1995) (disagreeing with *Collins,* but finding *Ratzlaf* "neither useful nor applicable" to the offense of receiving a firearm while under indictment, *see* 18 U.S.C. § 922(n)). We are not persuaded that *Ratzlaf's* analysis requires the overruling of *Collins.*

In *Ratzlaf,* the Court considered the meaning of 31 U.S.C. § 5322(a) (1988), which at the pertinent time set out criminal penalties for persons "willfully violating" the prohibition in 31 U.S.C. § 5324 against structuring cash transactions to avoid the filing of a currency transaction report. The Court concluded that to convict a person of "willfully violating" § 5324, the government must prove that the defendant "knew the structuring in which he engaged was unlawful." 510

U.S. at 149, 114 S.Ct. at 663. In reaching that conclusion, the *Ratzlaf* Court did not purport to define the term "willfully" with respect to all of its uses in the United States Code. Rather, the Court cautioned that " '[w]illful,' . . . is a 'word of many meanings,' and 'its construction [is] often . . . influenced by its context.' " *Id.* at 141, 114 S.Ct. at 659 (quoting *Spies v. United States,* 317 U.S. 492, 497, 63 S.Ct. 364, 367, 87 L.Ed. 418 (1943)). The Court found that both the statutory context of § 5322(a) and the societal and regulatory context of structuring indicated that "willfully" as used in § 5322(a) meant that the government must prove that the defendant knew of the prohibition against structuring and intended to violate that very provision.

As to the statutory context, the Court noted that § 5324 itself contains a mens rea element, as it states that structuring is prohibited if done *"for the purpose of* evading the reporting requirements of section 5313(a)." 31 U.S.C. § 5324 (emphasis added). The Court reasoned that, in light of the "purpose" requirement specified in § 5324, if "willfully" in § 5322(a) meant merely that the government was required to prove that the defendant knew and intended that the reporting requirement would be avoided, the term "willfully" would be inappropriately rendered surplusage. *See Ratzlaf,* 510 U.S. at 140–41, 114 S.Ct. at 658–59.

As to societal context, the Court noted that in many circumstances, the structuring of financial transactions to avoid taxation or reporting requirements has been perfectly lawful. *See id.* at 144–46, 114 S.Ct. at 660–62 (giving examples of lawful structuring to avoid payment of an 1862 stamp tax or to avoid liability under current statutes imposing gift tax). The Court stated that

> [i]n light of these examples, we are unpersuaded by the argument that structuring is so obviously "evil" or inherently "bad" that the "willfulness" requirement is satisfied irrespective of the defendant's knowledge of the illegality of structuring.

*Id.* at 146, 114 S.Ct. at 662.

We view the regulatory scheme with respect to firearms dealing as significantly different. Section 922(a)(1)(A), unlike § 5324, contains no mens rea element of its own. It simply states that it is unlawful for an unlicensed person to engage in the business of dealing in firearms. *See, e.g., Collins,* 957 F.2d at 74 (section 922(a)(1) "contains no *scienter* requirement"); *United States v. Hayden,* 64 F.3d at 131 ("contains no mens rea requirement"). Thus, but for the presence of § 924(a)(1)(D), § 922(a)(1)(A) would impose strict liability. No matter what mental state "willfully" in § 924(a)(1)(D) is interpreted to mean, therefore, neither § 924(a)(1)(D) nor any part of § 922(a)(1)(A) would be redundant.

■ We also recognize that subsection (B) of § 924(a)(1) provides penalties for "knowing[ ]" violations of certain parts of § 922 other than § 922(a)(1)(A). The use of "willfully" in subsection (D) of § 924(a)(1) in connection with violations of § 922(a)(1)(A), when contrasted with the use of "knowingly" in subsection (B) in connection with violations of other provisions, plainly indicates that Congress meant to require a higher level of scienter before punishment could be imposed for violation of § 922(a)(1)(A) than for violation of the provisions listed in subsection (B). *See, e.g., United States v. Hayden,* 64 F.3d at 129–130; *United States v. Obiechie,* 38 F.3d at 314–15; *see generally United States v. Hopkins,* 53 F.3d 533, 539 (2d Cir.1995) ("willful" is a higher state-of-mind requirement than "knowing"), *cert. denied,* — U.S. ——, 116 S.Ct. 773, 133 L.Ed.2d 725 (1996). In order to prove that a defendant "knowingly" engaged in prohibited conduct, the government need only show that he knew he was engaging in that conduct, not that he knew his conduct was unlawful. *See, e.g., United States v. Sherbondy,* 865 F.2d 996, 1001–03 (9th Cir.1988) ("knowing[ ]" violation, as used in § 924(a)(1)(B), requires proof only that defendant had knowledge of the acts or omissions giving rise to the criminal charges, not that defendant had "knowledge of the law"). This standard for proof of "knowing" conduct is below the standard used in *Collins* with respect to willfulness, for in assessing whether the failure of the district court in that case to instruct the jury as to willfulness was harmless error, we ruled that the error was harmless because there was ample evidence

to "demonstrate[ ] that Collins understood that his firearms sales violated the law." 957 F.2d at 77.

Thus, though *Collins* did not discuss § 924(a)(1)(B) and that subsection's use of "knowingly" as it contrasts with § 924(a)(1)(D)'s use of "willfully," and though the *Collins* interpretation does not require proof that the defendant had knowledge of the specific statute he is accused of violating or the specific intent to violate that precise provision, we do not read *Collins* as equating "willfully" with "knowingly," for it applied a higher standard than "knowingly" when it relied on the presence of proof that Collins knew his conduct was unlawful. In sum, *Collins's* interpretation did not render any part of § 924(a)(1) surplusage.

Moreover, we consider *Ratzlaf's* conclusion inapplicable here because the history of firearms regulation has been far different from the history of financial structuring. As discussed in *Ratzlaf*, "currency structuring is not inevitably nefarious," 510 U.S. at 144, 114 S.Ct. at 660–61, and many kinds of purposeful financial structuring are entirely lawful. Thus, inclusion of the willfulness element in the structuring offense serves the purpose of differentiating that offense from types of deliberate structuring that are not prohibited. In contrast, firearms are inherently dangerous devices that have long been subjected to regulation, including licensing requirements, *see, e.g.,* Federal Firearms Act, Pub.L. No. 75–785, 52 Stat. 1250 (1938); Act of May 25, 1911, ch. 195, 1911 N.Y. Laws 442, 444 (regulating sale of firearms); Act of April 5, 1946, ch. 532, 1946 N.Y. Laws 1172, 1172 (imposing licence requirement). Under the terms of § 922(a)(1), which was enacted in 1968, Omnibus Crime Control & Safe Streets Act of 1968, Pub.L. No. 90–351, § 902, 82 Stat. 197, 228, all unlicensed dealing in firearms— whether interstate or intrastate—is prohibited, *see, e.g., United States v. Ruisi,* 460 F.2d 153, 155–56 (2d Cir.), *cert. denied,* 409 U.S. 914, 93 S.Ct. 234, 34 L.Ed.2d 176 (1972), and prior to the addition of § 924(a)(1)(D)'s "willfully" requirement in a 1986 amendment, § 922(a)(1) imposed strict liability for firearms dealing without a license. Plainly, there was no need to introduce a "willfully" element to inform gun dealers that unlicensed dealing was unlawful.

In sum, *Collins 's* interpretation of "willfully" did not render any part of the firearms statute redundant, and it did not ignore the historical context of the introduction of the willfulness element. We conclude that *Ratzlaf* is not applicable here and does not undermine *Collins.*

### 3. *The District Court's Application of Collins*

■ Finally, we reject defendants' contention that they are entitled to a new trial on the ground that the instructions given by the district court on willfulness did not conform to the standard set by *Collins.* Since defendants did not object to the instructions on that ground, they are not entitled to relief unless the instructions as given constituted plain error. *See* Fed.R.Crim.P. 52(b); *United States v. Tannenbaum,* 934 F.2d 8, 14 (2d Cir.1991) (objections to district court's instructions must "state 'distinctly the matter to which [the defendant] objects and the grounds of the objection' " (quoting Fed. R.Crim.P. 30)). An error is "plain" within the meaning of Rule 52 if it (a) was "clear" or "obvious," and (b) "affec[ted] substantial rights," which "in most cases ... means that the error must have been prejudicial." *United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993) (internal quotation marks omitted). It is the defendant who bears the burden of showing prejudice. *See id.*

In explaining willfulness in the present case, the district court instructed the jury, in pertinent part, as follows:

An act is "knowing[ ]" if it is done voluntarily and purposefully and not because of mistake, inadvertence, or other innocent reason.

An act is "willful" if it was done knowingly, deliberately, and with an evil purpose. An act is not done willfully if it is done as a result of mistake, carelessness, lack of an evil purpose or motive, or some other innocent reason.

It is not necessary for a defendant to know he was breaking a particular law and whether or not an act is knowing and wilful

has nothing to do with the defendant's personal or private reasons for committing the act, so long as the act is done with an evil purpose.

(Trial Transcript ("Tr.") 577.) Defendants contend that references to "evil purpose" do not adequately convey the *Collins* principle that a defendant must have had knowledge that his conduct was generally unlawful. They argue that a jury could mistakenly construe the phrase "evil purpose" to encompass acts that the jurors themselves find to be immoral, regardless of whether the defendant knew them to be illegal. For two reasons we conclude that the above instructions did not constitute plain error.

First, the charge was not a "clear" and "obvious" error, for in many cases over the years, courts have described willfulness provisions in criminal statutes as requiring proof of an "evil motive" or "evil purpose." *See, e.g., United States v. Murdock*, 290 U.S. 389, 398, 54 S.Ct. 223, 226, 78 L.Ed. 381 (1933); *Spies v. United States*, 317 U.S. 492, 498, 63 S.Ct. 364, 367–68, 87 L.Ed. 418 (1943); *United States v. Bishop*, 412 U.S. 346, 360, 93 S.Ct. 2008, 2017, 36 L.Ed.2d 941 (1973); *United States v. Andreen*, 628 F.2d 1236, 1241 (9th Cir.1980); *United States v. Jerde*, 841 F.2d 818, 821 (8th Cir.1988). In *Murdock*, for example, the Supreme Court held that to convict a person of "willfully" refusing to answer questions related to his income tax liability, the government must show that the defendant's failure to respond was "prompted by bad faith or evil intent," by which the Court meant that the defendant was acting with knowledge of his obligation to respond and without a justifiable claim of privilege. *See also United States v. Andreen*, 628 F.2d at 1241 ("willfully" as used in 18 U.S.C. § 664, prohibiting willful conversion of pension plan funds, "means ... done with a fraudulent intent or a bad purpose or an evil motive"); *United States v. Jerde*, 841 F.2d at 821 ("[T]he words 'bad purpose or evil motive' are merely another way to convey the concept of willfulness." (internal quotation marks omitted)); *id.* ("[T]he terms 'bad purpose or evil motive' and 'willfulness' are essentially synonymous.").

Thus, the district court's explanation of willfulness as bespeaking an "evil purpose" was consistent with a long line of cases. Moreover, in the present case that explanation was preceded by an instruction that the government was required to prove that defendants entered into the alleged conspiracy "with a purpose to violate the law" (Tr. 575), and was accompanied by the instruction that they need not have known they were breaking "a particular" law (Tr. 577). While it might have been helpful to the jury for the court to specify that the defendant must be proven to have known that his conduct was generally unlawful, we conclude that in light of the above authorities and the instructions as a whole, the district court did not commit a clear or obvious error.

Second, defendants have not shown that their substantial rights were affected by the instruction as given, for the evidence amply showed that they knew their conduct was unlawful. The record included evidence that the gun sales to Rosado were always conducted by defendants in a furtive manner; that lookouts, including Hamilton, were used to alert Allah if the police were approaching; that as to both the first and the last sales, Allah moved the transactions to new locations at the last second because it was too "hot" to complete the exchanges at the initially designated sites; that during the first transaction, lookouts shouted that police were nearby, causing an interruption until Allah was reassured that the situation was "cool"; that, after the first transaction was complete, Hamilton stated that he did not want to ride in Rosado's car because the guns were present; and that after the penultimate transaction, Allah conveyed concerns that Rosado was a police officer but indicated that he would nevertheless proceed with the next transaction because he was willing to "take the chance" that Rosado was a policeman. Thus, the evidence overwhelmingly showed that defendants knew they were engaging in unlawful activity, and they have not met their burden of showing that any error or lack of clarity in the district court's charge on willfulness caused them prejudice.

### B. The "Natural and Probable Consequences" Charge

In instructing the jury as to how to go about determining whether defendants' conduct was intentional, the court stated in part as follows:

Knowledge, willfulness and intent exist in the mind, and since it is not possible to look into a man's mind to see what went on, the only way you have at arriving at a decision on these questions is for you to take into consideration all the facts and circumstances shown by the evidence, including the exhibits, and to determine from all such facts and circumstances whether the requisite knowledge, willfulness, and intent were present at the time in question.

*In making this determination, you should presume that the person intends the natural and probable consequences of his acts.*

(Tr. 577–78 (emphasis added).) Defendants contend that the italicized sentence requires reversal under the Supreme Court's decision in *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). The government concedes that that sentence was error, but it points out that defendants did not object to this portion of the charge, and it argues that the error did not constitute plain error.

We agree that the sentence in question was erroneous. In *Sandstrom,* the Supreme Court ruled that an instruction that "the law presumes that a person intends the ordinary consequences of his voluntary acts" violated the Fourteenth Amendment's requirement that the prosecution prove every element of a criminal offense beyond a reasonable doubt. 442 U.S. at 512, 524, 99 S.Ct. at 2459. Further, even before *Sandstrom,* this Court had expressly disapproved, in *United States v. Bertolotti,* 529 F.2d 149 (2d Cir.1975), and other cases, instructions that, "in determining whether defendants had the requisite knowledge, wilfulness and intent, the jurors 'should presume that a person intends the natural and probable consequences of his acts.' " *Id.* at 159. Given the plain import of these longstanding precedents, we agree with defendants that the presumption language used by the district court in the present case constituted an error that was clear and obvious.

Nonetheless, the instruction did not constitute "plain" error because defendants have not met their burden of showing that the error affected their substantive rights. In assessing whether there was prejudice, we must consider the erroneous sentence in the context of the charge as a whole. *See, e.g., Francis v. Franklin,* 471 U.S. 307, 315, 105 S.Ct. 1965, 1971–72, 85 L.Ed.2d 344 (1985); *Fratarcangelo v. Smith,* 792 F.2d 40, 43 (2d Cir.1986); *see also Rose v. Clark,* 478 U.S. 570, 580–82, 106 S.Ct. 3101, 3107–08, 92 L.Ed.2d 460 (1986) (harmless-error analysis is appropriate in assessing whether a *Sandstrom* error warrants vacatur of a criminal conviction); *Mancuso v. Harris,* 677 F.2d 206, 211 (2d Cir.) (*Sandstrom* error harmless where "charge, when viewed as a whole, made it quite clear to the jury that it was to consider *all* of the evidence in the case in deciding whether the defendant possessed the intent necessary to commit the crime of burglary"), *cert. denied,* 459 U.S. 1019, 103 S.Ct. 382, 74 L.Ed.2d 514 (1982); *Rock v. Coombe,* 694 F.2d 908, 915–17 (2d Cir.1982) (*Sandstrom* error harmless even though the erroneous presumption language was used three times and was twice characterized as a "fundamental" rule, because the erroneous language "was in the midst of a balanced statement that intent was to be determined from conduct, speech, and all of the circumstances"), *cert. denied,* 460 U.S. 1083, 103 S.Ct. 1773, 76 L.Ed.2d 345 (1983); *Payne v. LeFevre,* 825 F.2d 702, 708 (2d Cir.) (*Sandstrom* error harmless where "[n]o rational jury could [have found] that [the defendant] picked up his shotgun, pumped it, used it to push his apartment door open and then pulled the trigger at point-blank range but did not intend to fire the shots" (internal quotation marks omitted)), *cert. denied,* 484 U.S. 988, 108 S.Ct. 508, 98 L.Ed.2d 506 (1987).

Here, the trial court had clearly instructed the jury that a "defendant is presumed by law to be innocent" (Tr. 569), and the erroneous sentence permitting a presumption of intent was surrounded by instructions stating

that defendants' "criminal intent" was to be proven by their "own actions and conduct" (Tr. 575), and repeatedly reminding the jury that the government had the burden of proving each element of each offense beyond a reasonable doubt. For example, shortly before the erroneous sentence, the court stated that

> [t]he government must prove beyond a reasonable doubt by the defendant's own actions and conduct that he knowingly and willfully entered into the conspiracy with a criminal intent, that is with a purpose to violate the law, and agreed to take part in the conspiracy to further promote its unlawful objectives.

(Id. at 575 (emphasis added).) Shortly after the erroneous sentence, the court stated, "[f]or each defendant, before you may find him guilty of [unlicensed dealing in firearms], you must be convinced that . . . the government has proved each . . . element[ ] beyond a reasonable doubt." (Tr. 582.) Thus, the Sandstrom error was preceded and followed by correct instructions as to the presumption of innocence and the government's burden to prove every element beyond a reasonable doubt.

Further, the cases in which a Sandstrom error is likely to be prejudicial are cases in which intent is a seriously contested issue. In Sandstrom, for example, the defendant was charged with "deliberate homicide," and he admitted to killing the victim; his principal defense at trial was that, due to a mental infirmity aggravated by alcohol consumption, he had not killed intentionally. 442 U.S. at 512, 99 S.Ct. at 2453. Under those circumstances, an instruction directing the jury to "presume" that the defendant intended the ordinary consequences of his acts had the effect of placing the burden of proving innocence on the defendant. Id. at 521, 99 S.Ct. at 2458. In the present case, in contrast, there was no issue as to defendants' intent. Defendants' closing arguments instead disputed whether the evidence showed that defendants' activities rose to the level of a business; they mounted a general attack on the conduct of the investigation and the credibility of the police witnesses; and Hamilton maintained that he was not involved in the business at all. Defendants did not argue, and in light of the evidence presented, could not credibly have argued, that even if they were engaged in the business of dealing in firearms, they were doing so only unintentionally or by accident.

We note that the court did not instruct the jury to indulge a similar presumption with respect to knowledge. Thus, the error could not have led the jury to presume, from the fact that the acts were undertaken, that defendants knew their acts were unlawful.

We conclude that the Sandstrom error was not plain, and indeed was harmless.

## C. Instructions on the Definition of a Dealer

■ For purposes of federal firearms offenses, a "dealer" engaged in the business of dealing in firearms is defined as "a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms." 18 U.S.C. § 921(a)(21)(C). At trial, defendants requested that the court's instruction to the jury on the meaning of "dealer" use the precise language of § 921(a)(21)(C). The court declined, instructing instead as follows:

> The term "dealer" as used in this indictment means a person who is engaged in the business of selling firearms. A person is engaged in the business if the person devotes time, attention, or labor to dealing in firearms as a regular course of trade or business for the purpose of a livelihood or profit.
>
> In order for the government to prove that a particular defendant was engaged in the business of dealing in firearms, it is not sufficient that the government prove that the defendant was involved in a single transaction involving the sale of a firearm, but must show a regular course or repetitive conduct. However, such transaction may be considered by you along with the other evidence of whether this activity was a continuing one.
>
> It is not a necessary element of the crime that a defendant's only business

be that of selling firearms, nor need it be a significant source of income for him. (Tr. 583–84.) Defendants challenge this instruction chiefly on the ground that it did not state that profit must have been their "principal" purpose. They argue that with the omission of the word "principal," the court failed to inform the jury that pecuniary gain had to be defendants' primary objective, rather than merely one of a number of equally or more important objectives. We see no · basis for reversal.

In the circumstances of this case, any error in the court's reference to "the purpose," without the modifier "principal" was undoubtedly harmless because it redounded to defendants' benefit, not their detriment. The instruction that the government was required to prove that pecuniary gain was "the purpose" rather than the "principal" purpose could not reasonably be interpreted as permitting the jury to find that defendants were dealers if pecuniary gain was only one of a number of motives. Rather, the phrase "the purpose" was more likely to be interpreted as requiring the government to prove that pecuniary gain was defendants' only objective.

Moreover, there was no basis in the record for the jury to conclude that defendants' engaging in the various transactions with Rosado was motivated by anything other than a desire for profit. There was, for example, no evidence that defendants were selling guns for the various nonpecuniary reasons specified in the statute, such as "the enhancement of a personal collection" or "a hobby." 18 U.S.C. § 921(a)(21)(C). To the contrary, in their conversations with Rosado, both Allah and Hamilton plainly indicated that the weapons they offered to sell were coming, or could be ordered, from outside sources. For example, in his first tape-recorded telephone conversation with Rosado, Allah discussed selling Rosado a dozen guns from a shipment of more than two dozen he expected to receive the following day. In another taped conversation, Allah stated that he had several people bringing him "dough" from selling guns for him "in the streets." (E.g., "I sent dudes out, I'll give them 2, 3 shits [i.e., guns] a piece [sic] and go out

make the dough off of them, brings mine back. Um ... I got like three dudes, I got like 3 apiece out. So that's like 9 I got out in the streets. Nah, matter of fact, it's more than 9, 'cause I got like 13 altogether.") Throughout the course of their transactions, Allah negotiated with Rosado over the price of the guns purchased, and like any savvy businessmen Allah and Hamilton "automatically" offered discounts for bulk purchases. We conclude that defendants' challenge to the instruction on the meaning of "dealer" presents no basis for reversal.

### D. *Other Contentions*

Defendants' other arguments include their contention that the district court dealt inadequately with the presumption of innocence in its voir dire of prospective jurors and in its instructions to the jury prior to. deliberations, and Hamilton's contention that the evidence was insufficient to support his convictions. These contentions are without merit and do not warrant extended discussion.

■■■ Defendants' contention that they are entitled to a new trial because the district court did not inquire during voir dire into prospective jurors' ability to apply the presumption of innocence is meritless. The trial judge has broad discretion in examining prospective jurors, *see, e.g., United States v. Maldonado–Rivera*, 922 F.2d 934, 970 (2d Cir.1990), *cert. denied*, 501 U.S. 1211, 111 S.Ct. 2811, 115 L.Ed.2d 984 (1991); *United States v. Gillette*, 383 F.2d 843, 849 (2d Cir. 1967), and we have held that the refusal to ask such questions does not constitute an abuse of that discretion, *see id.*

■■■ Nor do we find merit in the contention that the instructions given at trial on the presumption of innocence were inadequate. Although the failure to give any instruction whatever as to the presumption of innocence may constitute a denial of due process in some circumstances, *see Taylor v. Kentucky*, 436 U.S. 478, 490, 98 S.Ct. 1930, 1937, 56 L.Ed.2d 468 (1978); *Kentucky v. Whorton*, 441 U.S. 786, 789–90, 99 S.Ct. 2088, 2090, 60 L.Ed.2d 640 (1979) (per curiam) (whether failure to give instruction violates due process depends on "the totality of the

circumstances"), a defendant is not entitled to a particular form of instruction, *see generally Victor v. Nebraska*, 511 U.S. 1, 5, 114 S.Ct. 1239, 1242–43, 127 L.Ed.2d 583 (1994), and the adequacy of the charge that was given must be assessed in light of the instructions as a whole. *See, e.g., United States v. Kallash*, 785 F.2d 26, 29–30 (2d Cir.1986); *United States v. Joly*, 493 F.2d 672, 677 & n. 10 (2d Cir.1974). In the present case, the district court charged the jury, *inter alia*, that

> the defendant is presumed by law to be innocent. The law does not require a defendant to prove his innocence or produce any evidence at all. The government has the burden of proving him guilty beyond a reasonable doubt, and if it fails to do so you must acquit.

(Tr. 569.) This instruction was constitutionally adequate.

■■■ Finally, we reject Hamilton's contention that the evidence was insufficient to convict him of engaging in the business of dealing in firearms without a license or of conspiring to engage in that business. In challenging the sufficiency of the evidence, a defendant bears a heavy burden. *See, e.g., United States v. Rea*, 958 F.2d 1206, 1221 (2d Cir.1992); *United States v. Esdaille*, 769 F.2d 104, 108 (2d Cir.), *cert. denied*, 474 U.S. 923, 106 S.Ct. 258, 88 L.Ed.2d 264 (1985). When reviewing such a challenge, we view the evidence in the light most favorable to the government, drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility, *see, e.g., United States v. Rea*, 958 F.2d at 1221; *United States v. Stratton*, 779 F.2d 820, 828 (2d Cir.1985), *cert. denied*, 476 U.S. 1162, 106 S.Ct. 2285, 90 L.Ed.2d 726 (1986), and we must affirm the conviction so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt, *see, e.g., United States v. Giraldo*, 80 F.3d 667, 673 (2d Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 135, 136 L.Ed.2d 83 (1996); *United States v. Taylor*, 464 F.2d 240, 244–45 (2d Cir.1972).

■■■ In order to prove a willful violation of § 922(a)(1)(A)'s prohibition against unlicensed dealing in firearms, the government must present evidence from which it can reasonably be inferred that the defendant was not a licensed dealer, that he "devote[d] time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms," 18 U.S.C. § 921(a)(21)(C), and that he acted with knowledge that his conduct was unlawful. In order to prove a conspiracy, the government must present evidence from which it can reasonably be inferred that the conspiracy alleged in the indictment existed, that the defendant knowingly joined and participated in it, and that a coconspirator performed an overt act in furtherance of the conspiracy. There was no lack of proof here.

The government presented evidence that neither defendant was licensed to deal in firearms. Hamilton participated in the first gun sale by describing the available guns and by taking Rosado to meet Allah after making sure Rosado had the money to pay for the guns. The evidence that Hamilton was aware that his conduct was illegal included his acting as a lookout for that first gun sale—during which there was a shouted alarm that the police were in the area—and his subsequent refusal to ride with Rosado while Rosado was transporting the just-purchased guns. That Hamilton's participation in that transaction was part of a regular course of trade or business conducted with the expectation of repetitive sales for profit could be inferred from, *inter alia*, Hamilton's own description of his role in the operation—consistent with his actions in connection with the first sale—as the "middleman," whose responsibilities included making sure that the buyer was "legit" and had the right amount of money; from his statement that he could get 9–millimeter pistols for Rosado, and his asking "how many do you want?"; from his promise that he would take care of Rosado "anytime you ever want some"; from his explanation to Rosado that when Allah and Hamilton had not yet actually received an expected gun shipment they "d[id] not believe in" calling "whoever," thereby suggesting an established mode of operation involving a number of customers; and from his

**46**

statement that discounts for bulk sales were routine.

Finally, the evidence was ample to permit a rational juror to infer that, as alleged in the indictment, Hamilton and Allah were co-conspirators in the business of dealing in firearms. For example, in connection with the first sale, when Hamilton said he had guns that he would sell to Rosado, he was referring to the guns that Rosado thereafter received from Allah. In connection with Rosado's subsequent attempt to purchase additional guns from Allah, Hamilton described his own general role as middleman. And in describing his and Allah's inventory and methods of doing business, Hamilton repeatedly used the pronoun "we."

### CONCLUSION

We have considered all of defendants' arguments on this appeal and have found in them no basis for reversal. The judgments of conviction are affirmed.